UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRUCE TODD,<br><br>    Plaintiff,<br><br>    v.<br><br>SHOREBANK n/k/a URBAN PARTNERSHIP BANK,<br><br>    Defendant. | No. 12 CV 6575<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bruce Todd has filed a six-count complaint against ShoreBank (now out of business) and Urban Partnership Bank ("UPB") alleging violations of the Cranston-Gonzales Amendments of the Real Estate Settlement Procedures Act, 12 U.S.C. §2605 ("RESPA") which requires certain responses from loan servicers upon receipt of a Qualified Written Request ("QWR") from a borrower (Count I), the Illinois Consumer Fraud and Deceptive Practices Act (Count II), the Illinois High Risk Home Act (Count III), as well as common law claims for breach of contract (Count IV), Promissory Estoppel (Count V), and fraud (Count VI). Defendant UPB now moves to dismiss all counts under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. For the following reasons, I grant the Motion to Dismiss Count I and relinquish jurisdiction over the remaining claims.

### BACKGROUND

In June 2008, Plaintiff Todd applied for a mortgage loan with ShoreBank of Chicago for the purpose of purchasing a residential property located at 7921 S. Ridgeland Ave, Chicago, Illinois. The property was a vacant and vandalized single family home held at the time as REO

property by Deutsche Bank National Trust. Todd contends he advised ShoreBank representatives that the property was uninhabitable and needed extensive repairs before he could use it as a primary residence. Todd further alleges he relied on statements from ShoreBank that they would loan him $76,000 in addition to the purchase price of $104,405, so he could complete the repairs.[1]

Plaintiff attaches to the Complaint a Uniform Residential Loan Application (Exhibit A) signed by Todd for a total loan amount of $139,148.75[2], which includes $40,000 in "Alterations, improvements, repairs." Plaintiff also attaches an appraisal of the property (Exhibit B) on behalf of ShoreBank that values the property at $180,000 using comparisons to three "comparable" local properties, but includes language that indicates the appraisal is "based on the hypothetical condition the repairs/renovations to the subject have been completed at the time of observation and that all mechanical systems are in satisfactory working order."[3]

Plaintiff did not attend the closing on August 25, 2008, but sent counsel with Power of Attorney on his behalf to sign the Final Statement (Exhibit C), Promissory Note (Exhibit D), Mortgage (Exhibit E), and Disclosure Statement (Exhibit F). Relevant to his Complaint, the Final Statement and Disclosure Statement list "Unadvanced Rehab Reserves – ShoreBank" as a "straight line of credit" in the amount of $54,685 ($21,315 less than Plaintiff expected) for a total mortgage note of $153, 065. Payments were to vary for the first five months during the rehab period depending on the amount used from the line of credit. Plaintiff contends he objected to

---

[1] Plaintiff's Complaint does not identify by name the person or persons who made the statements or produce documentation regarding the total loan amounts promised.
[2] The application arrives at this figure by adding the purchase price of $104,405, $40,000 in "Alterations, improvements, repairs", $1,365.48 in "Estimated prepaid items", and $2,590.73 in "Estimated closing costs" for a total of $148, 361.21. "Cash from Borrower" of $9,212.46 is subtracted for a total loan amount applied for of $139,148.75.
[3] Plaintiff's Exhibit B, pages 9–10, values the home in "fair condition" based on repairs and renovations being completed to an enclosed rear porch, updated electrical and plumbing systems, new HVAC system, finishing the basement, repair of plaster drywall, updated kitchen and bath, and new interior painting. The appraisal values the property at $110,000 "as-is." No mention is made of the need for a new roof.

the reduced line of credit "once he learned of it" and went to see ShoreBank personnel, Eddie Barns and Paul Mitchell,[4] who advised him there was nothing that could be done since closing had already occurred.

Plaintiff maintains he tried to apply for other loans to make up the shortfall, but was unsuccessful and therefore he did not initially access any of the line of credit in order to keep his mortgage payment from increasing. Plaintiff further asserts that since he could not move into the new property in its unimproved condition, he lived and paid rent in an apartment.

The Complaint states that Mitchell contacted Plaintiff in summer 2009 and threatened to "take the $54,685 back" if Plaintiff did not use the line of credit. Accordingly, Todd withdrew $20,000 from the line of credit and began rehabbing the property starting with an expenditure of $14,500 for a new roof and $9,000 for interior demolition and electrical work. When Todd requested an additional $10,000 from the line of credit in fall 2009, ShoreBank refused to extend more credit allegedly because Plaintiff used funds from the first draw to repair the roof. ShoreBank purportedly refused to produce documents justifying its refusal to extend more credit and Plaintiff ceased further rehab work.

The Complaint details two pieces of correspondence that form the basis for Plaintiff's only allegation of a federal law violation (Count I – RESPA). First, on March 14, 2011, a law firm hired by Plaintiff sent a letter to Residential Credit Solutions ("RCS") requesting any documentation explaining why ShoreBank refused to extend further credit or where a requirement for pre-approval of rehab work was located in the loan documents (Exhibit H). According to the Complaint, this letter was answered on August 24, 2011 by RCS with an enclosed copy of the Promissory Note. While not identified as a QWR in the March 14th letter or

---

[4] It is not clear from the Complaint if Barns and Mitchell were the employees who allegedly made the original line of credit promises.

3

in the Complaint, Plaintiff's Response to Defendant's Motion to Dismiss maintains that this first letter qualifies as a QWR.

A second letter, written on Plaintiff's behalf and claiming to be a "qualified written request", was sent to both RCS and UPB on February 21, 2012 alleging "illegal conversion of construction loan funds and RESPA violations" (Exhibit J). This letter requested copies of all documents associated with the loan including all information related to origination, assignment, payment, escrow, and construction loan disbursements. The letter further makes statements alleging misrepresentations and omissions during the loan origination process and questions the role of UPB as well as maintains that the loan is not past due since Todd did not receive the "monies promised on the HUD statement." Plaintiff's Complaint contains a response letter from RCS on February 29, 2012 (Exhibit K) informing Todd that RCS no longer serviced the loan since September 1, 2011. Included in this correspondence is a copy of a letter RCS sent to Plaintiff on August 15, 2011 notifying Todd of the assignment of the loan from RCS to UPB. Plaintiff asserts he never received a response from UPB from this second inquiry. Plaintiff contends that each QWR triggered a response requirement from the Defendant under RESPA including abatement from reporting negative credit information to the credit bureaus. Plaintiff alleges damages from the negative reporting and failure to deliver the promised funds in a timely manner.

Activities and documents also related to the loan origination form the basis for the remaining state law and common law counts. The Complaint alleges misrepresentations, fraud, and deceptive practices on loan origination documents prepared by ShoreBank (and signed by Todd) along with failure to deliver the promised line of credit funds.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted[.]" To avoid dismissal, Todd's complaint must then contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The court will accept all well-pleaded facts in the complaint as true, "but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell A. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Federal Rule of Civil Procedure 10(c) permits judgment by the court based on the pleadings alone, including the complaint, the answer, and any written instruments attached as exhibits. *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998).

**DISCUSSION**

**A.     Count I – RESPA Violation**

In 1974, Congress passed RESPA as a consumer protection measure to furnish accurate and timely information to residential borrowers of a federally related mortgage loan on "the nature and costs of the settlement process" and to insure borrowers are protected from

5

unnecessarily high settlement charges and abusive practices. 12 U.S.C. § 2601(a) (Congressional findings).

In 1990, RESPA was amended as part of the Cranston-Gonzalez National Affordable Housing Act to include §2605 that created certain disclosure obligations when mortgage servicing is transferred and certain response requirements when a borrower sends a QWR to a loan servicer. 12 U.S.C §2605(a)(b)(e). This section also provides a cause of action for individual damages for failure to comply with these requirements. 12 U.S.C. §2605(f)(1). Plaintiff's Complaint alleges violations of §2605(e) and so must be analyzed to determine if one or both of his letters qualify as a QWR.

For purposes of the act, a QWR is defined as "written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. §2605(e)(1)(B).

Further, "[i]f any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for *information relating to the servicing of such loan*, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(a) (emphasis added). Additionally, "Servicing" is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan". 12 U.S.C. §2605(i)(3).

Plaintiff's Exhibit H is the letter of March 14, 2011 from Todd's attorney to RCS. This letter informs RCS that Todd took out a "loan with ShoreBank which included a rehabilitation hold back" and received "approximately $20,000.00 which was used to replace the roof." The letter indicates that Todd "was told that he was in breach of the contract with the bank and no additional funds would be given from the rehabilitation hold back." The attorney informs RCS that she could find no information in the documents requiring pre-approval of rehab work and asks RCS to forward "any documentation which would limit the rehabilitation work."

As a practical matter, since §2605 imposes a time requirement on servicers to respond to borrower inquiries, a letter sent to RCS could not trigger a duty to respond for UPB. Plaintiff's Complaint never alleges this letter was sent to UPB. Plaintiff's own Exhibit K is a letter purportedly sent to Todd by RCS on August 15, 2011 informing him of the transfer of the loan to UPB effective 9/01/2011. RCS is not a named defendant in this action and UPB could not possibly have a duty under §2605 to respond to the letter of March 14, 2011 in a timely manner if it never received the inquiry and did not become the servicer of the loan until almost six months later.

In addition, the substance of the letter relates to matters of loan origination, not loan servicing. Plaintiff's Complaint reveals he was aware the line of credit was frozen as early as fall of 2009, more than a year prior to the March 14, 2011 letter to RCS. While this letter identified the name and account of the borrower, it was not for "information related to the servicing of such loan" as is required to trigger a loan servicer's duty to respond to borrower inquiries under the statute. 12 U.S.C. §2605(e)(1)(A). Questions regarding the amounts of a line of credit or restrictions related to its use are matters more specific to the original loan terms and documentation. *Cf. MorEquity, Inc. v. Naeem*, 118 F. Supp. 2d 885, 901 (N.D. Ill. 2000) (Issues

7

of the validity of a loan or mortgage documents do not relate to loan servicing). A servicer under RESPA is required to respond timely to borrower requests "to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties". 12 U.S.C. §2605(k)(1)(C). Accordingly, Plaintiff's letter of March 14, 2011 is not a valid QWR.

The same flaw is also fatal to the letter of February 21, 2012 sent to UPB. The first numerated item of this letter merely requests all documentation "pertaining to the origination of my mortgage" and the assignment of the loan to UPB. The second numerated item requests loan and payment history information as well as escrow payments. It also requests "construction loan payments" and asks "why the additional distributions were denied." The third numerated item makes claims of misrepresentation of the loan terms and omissions in the origination documentation. The final paragraphs question UPB's "role" in Todd's loan, reiterate his claim that monies are owed to him under the original terms of the loan, and offer to agree to refinance once more money has been "paid out to me." Nowhere among these requests can there be found a true borrower inquiry about an account error related to loan servicing. Plaintiff's Complaint admits he made no payments on the loan since January 2010. His requests in the letter simply revisit his original disputes related to terms of origination. Consequently, Plaintiff's letter of February 21, 2012 is not a valid QWR.

Plaintiff cites *Catalan v. GMAC Mort. Corp.* to support his position that both his letters are valid Qualified Written Requests under RESPA. 629 F.3d 676 (7th Cir. 2011). A careful reading of the decision, however, reveals key distinguishing differences between *Catalan* and Plaintiff's case. In *Catalan*, the Plaintiff couple bought a home with a Federal Housing Administration loan obtained through a mortgage company. *Id.* at 681. Although the first

payment on the loan was due on August 1, 2003, the mortgage company incorrectly input the first payment into the computer system as being due on July 1st. *Id.* By the time Plaintiffs made their first originally scheduled payment, the mortgage company erroneously reported them in default. *Id.* Without sending notice to the borrowers, the mortgage company assessed penalties and increased Plaintiff's monthly payment. *Id.*

This simple error cascaded into a nightmare situation for the Plaintiffs when the mortgage company refused to cash checks or apply payments for less than the incorrect amount due. *Id.* The nightmare compounded when the original mortgage company assigned the loan to GMAC without notifying the Plaintiffs. *Id.* at 682. Over the next eighteen months, Plaintiffs made numerous phone calls and sent five letters to the original mortgage company, GMAC, and the United States Department of Housing and Urban Development in order to correct the situation. *Id.* at 682–84. Plaintiffs sued for RESPA violations, and the district court, without deciding on the merits of the RESPA claims, granted summary judgment for GMAC. *Id.* at 684.

On appeal, the Seventh Circuit analyzed each of the Plaintiffs five letters and, applying the plain language of the statute, determined that two of the five inquiries qualified as valid QWRs. *Id.* at 687, 689. Although GMAC painted the letters as only disputing the debt and requesting reinstatement and thus not valid QWRs, the Court found this reasoning "untenable" and held that §2605(e) should be read broadly such that "[a]ny reasonably stated written request for account information can be a qualified written request." *Id.* at 686–87.

Further, the Court held that a QWR did not need to contain any "magic language" before a servicer must respond to a valid QWR. *Id.* at 687. "To be a qualified written request, written correspondence must reasonably identify the borrower and account and must "include a statement of the reasons for the belief of the borrower, *to the extent applicable,* that the account

9

is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.'" 629 F.3d 676 (7th Cir. 2011) (Quoting 12 U.S.C. §2605(e)(1)(B)(ii)).

However, each of the two letters classified by the *Catalan* Court as a valid QWR contained specific requests for information *related to errors in loan servicing* including incorrect due dates, un-cashed checks, and unapplied payments that resulted in the Plaintiff's woes. *Id.* at 687-90. In contrast, Todd's letters do not raise any issues of account errors due to misapplied payments, un-cashed checks, or incorrect due dates or statement balances by the loan servicer. Instead his grievances have their origins in the application and origination process almost two years earlier. The Ninth Circuit Court of Appeals agreed last year with the Seventh Circuit's broad definition of QWRs in *Catalan*, but held that any reasonable inquires still had to be related to issues of loan servicing, not origination. Medrano v. Flagstar Bank, FSB, 704 F.3d 661, 666 (9th Cir. 2012); *Accord* Arriaga v. Wells Fargo Bank, N.A., 09 CV 2115, 2013 WL 1303831 (N.D. Ill. Mar. 27, 2013); MorEquity, 118 F. Supp. 2d at 901.

Finding that neither of the Plaintiff's letters qualifies as a valid QWR, UPB had no response requirements under 12 U.S.C. §2605(e). Consequently, Count I of the Complaint is dismissed for failure to state a claim.

## B. Remaining State And Common Law Claims

After dismissing the only claim under which this court had original jurisdiction, I decline to exercise supplemental jurisdiction over the remaining state and common law claims pursuant to 28 U.S.C. §1367(c)(3). The parties are not diverse and the remaining claims do not raise federal issues; therefore I relinquish jurisdiction over the state and common law claims. *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("Hence the general rule

is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits").

## CONCLUSION

For the foregoing reasons, Count I is dismissed and I relinquish jurisdiction over the remaining claims.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: July 19, 2013